Mr. Verrilli? Mr. Chief Justice, and may it please the Court, Section 1113.2 of ERISA requires that claims for breach of fiduciary duty be brought within three years of when the plaintiff first had actual knowledge of the breach. In 2015, the Respondent, Sulyma, sued, claiming that his retirement plans imprudently over-invested in  commodities. But more than three years before that suit was filed, Sulyma received planned disclosures that apprised him of the precise investment allocations he later claimed were imprudent. The Ninth Circuit held that those disclosures would not trigger the three-year bar because Sulyma testified that he had not read them and Intel, therefore, had not established that he had subjective awareness of what was disclosed. The Ninth Circuit was wrong to read the statute to require proof of subjective awareness. Under Section 1113.2, planned participants have actual knowledge of facts that are actually given to them in mandatory ERISA disclosures. That reading respects ERISA's text and the statutory emphasis on the structural emphasis in the statute on robust disclosure by planned fiduciaries and private policing by planned participants. The Ninth Circuit's reading upends that balance. It effectively doubles from 3 to 6 years the period in which plaintiffs can exploit hindsight bias to second-guess investments even when plans have fully disclosed the basis for those investments, and it introduces arbitrariness and intractable proof problems. Now, one way to bring the correct interpretation of Section 1113.2 into focus is by considering the provision as it was originally enacted in 1974, and that's reproduced at pages 38 and 39 of the blue brief. The original statute provided that the 3-year limitations period would be triggered either when a plaintiff had actual knowledge of the breach or when the plan filed with the Department of Labor a report that included facts from which a participant could reasonably learn of the facts of the breach. Now, if you read the statute in the way that the Ninth Circuit read it, it doesn't make any sense as it was originally enacted, because the 3-year period would be triggered in a situation in which the plan disclosed to the Department of Labor the facts that established the breach, but not when the plan disclosed to the plan participants themselves in mandatory disclosures the very same facts that would trigger it if provided to the Department of Labor. That just doesn't make any sense of the statute. Our reading, in contrast, makes perfect sense of the statute. And if I could, I will start with the text, and I think try to take a minute and explain why we've got a perfectly reasonable linguistic understanding of Section 1113-2. And it's this. A plaintiff has actual knowledge of facts actually provided to him in mandatory disclosures, because when the plaintiff receives the disclosure, he has, in the word of the statute, past tense, had, but he has in his possession the body of knowledge contained in the disclosures. He possesses that knowledge. And that's the knowledge he actually has. Most people don't read them. You know, I — Or many. Many people don't read them. So how do you have actual knowledge if you haven't read it? So, Your Honor, I don't know that that's correct. I think, actually, with respect to these kinds of documents — If you disclose for the group of people who don't read them, how can you say that they have actual knowledge if they haven't read something? So I think the reason is because the phrase actual knowledge in this context in particular, but frankly in any context, isn't limited to subjective awareness in the way that the Ninth Circuit limited it. And I think that the willful blindness doctrine demonstrates that. Ginsburg. Mr. Verrilli, we do have the 6-year outer limit, and then there's a special shorter limit if you have actual knowledge. It's hard to read the word actual to mean something other than yes, I in fact know. And as Justice Kavanaugh pointed out, there are many people who don't read these mailings. I must say, I don't read all the mailings that I get about my investments. So I think with respect to what actual knowledge means in this statute, it's important to think about it in context. And it's really the idea of taking the phrase actual knowledge and treating it in this context as though it means the same thing in the other context in which it's used as a mistake. This is really a unicorn when it comes to statutes and limitations. This is the only place in the United States Code that we could find the phrase actual knowledge used in the statute of limitations, and our friends on the other side haven't identified any State statute of limitations that uses the phrase actual knowledge either. Roberts. Mr. Verrilli, I think you were about to push back on Justice Kavanaugh's assertion that people don't read these. Do you have any reason for us to assume the opposite of what I gather is a common  Verrilli, I won't ask for a show of hands, but do you have any reason to suppose that many people are? Verrilli, yes. Yes, I do. What is that? Well, I do think that this is important information. For many people, this information, how their retirement plans are going to be, how their retirement funds are going to be invested is very important. Many people say, I'm not sure it depends on it. Well, I'm sure, I mean, the fact is important, but whether people think the information is important, I'm just not, I'm just, well, I'd be surprised. I mean, it's one of those things, the more and more disclosures that are required, the less and less likely it is that people are going to look at them. And it seems to me that your argument depends upon the assumption that these are actually going to be read, so that we would dispense with the requirement of showing that they were actually read, because we assume that they were most often actually read. And I just don't think that's an accurate assumption. I don't think argument does depend on that assumption. I think that Congress set this system up in 1974. It made clear that the disclosure regime was a very important part of the regulatory program. And the point, as Congress said in 1974, of these robust disclosures, was to give plan participants the information they would need to police their rights. And so when Congress enacted, that's what the Senate report says in 1974 repeatedly. And, of course, in 1974, Congress also granted a private right of action to plan participants on regulatory duty. So I do think the system was set up on the understanding that this was important information and had to be conveyed to plan participants according to the statute and its implementing regulations in a manner that was readily comprehensible so that the average plan participant could understand it and could take action as necessary to police his or her rights. So I do think that the understanding that Congress is operating under here is that people do read these disclosures when they come. And if one looks at the, for example, the e-mail that Mr. Salima got, and you can see this at page, I think, 149 of the Joint Appendix with respect to the qualified default investment alternative disclosure, he gets an e-mail that says, the heading says, important information about your retirement plan. And it contains a link. And the link says, you should read the document in this link. And if you click on the link, it takes you not to some big giant document, but to an eight- or ten-page document that describes the investments in the various target fund plans. And if one looks at page 236 of the Joint Appendix, then we will see that for Mr. Salima's plan, it specifically says, the target asset allocation in this fund is 10 percent bond funds and short-term investments, 60 percent equity funds, 25 percent hedge funds, and 5 percent commodities. That's the precise thing he says is a breach of fiduciary duty. And the precise thing that he says is a breach of fiduciary duty, and it's disclosed to him right there in this document. Kagan. I'm going to go back to the question of whether or not there are circumstances in which the Court, by operation of law, will recognize that something other than subjective awareness can satisfy an actual knowledge standard. Because I would have thought about it a little bit differently. Not that the willful blindness is satisfying the actual knowledge inquiry, but rather that because you've been willfully blind, because you've deliberately ignored some piece of evidence, we will treat it as if you actually knew. But still, the willful blindness is a different thing. It's just that given your intent, we're going to treat it as one and the same. Well, but I think the way I would give that a little bit of a different nuance, Your Honor, is that I think with respect to willful blindness, what you're saying is even in a situation where it's not possible to prove that a defendant, and it's usually a criminal defendant or a defendant in some kind of enforcement action, has the subjective awareness necessary to satisfy an actual knowledge standard, you're going to impute that subjective awareness to the defendant. It's an imputation. Correct, because of their bad intent, shall we say, because of their saying, I'm purposely not going to know this. Right. But here you're saying not everybody who has actual knowledge is willfully blind in that way. That's correct. But I think that we're not. What we're saying is that by analogy, once you think here about the context, because what's happened with this actual knowledge standard, as I said, this is the only statute of limitations we can find in which it exists. The overwhelming number of situations in which it exists are the ones that we've been talking about here, situations in which you're trying to ascertain the level of culpability in a criminal action or an enforcement action. So you're transplanting it into a totally different environment here. And then not only that, but normally in statutes of limitations, when there's a knowledge element in a statute of limitations, it's something that works to the benefit of the plaintiff. In a typical statute of limitations, you'd say statute runs 6 years from a certain act or occurrence, but it would be either the later of that or 3 years after the plaintiff has or should have had knowledge. Here, the knowledge requirement is operating for a totally different reason. It's in the statute to protect the interests of the defendant. It takes the 6-year period of repose and cuts it in half when a plaintiff has actual knowledge, and I submit that. And therefore, the right way to think about this is by thinking about this in terms of the interest that this provision is in the statute to advance. And the interest that it's in the statute to advance, it seems to me, are sync up perfectly with the disclosure requirements that the statute imposes on planned fiduciaries. Ginsburg. If the statute had said should have had knowledge, you would plainly prevail. But it doesn't say should have had knowledge. It says actual knowledge. And you're reading the word actual out of the statute. Verrilli, I disagree with that characterization. We think the word actual does real and substantial work in our reading of the statute. We're not arguing that you should read this language as though it were a broad constructive knowledge standard. A broad constructive knowledge standard would be a new or should have known standard. And if it were a broad constructive knowledge standard, then the disclosure of the information to the planned participant, even if the information disclosed itself, wouldn't establish the facts of a breach of fiduciary duty. If it put the planned participant on notice such that a reasonable person would inquire further, that would be a constructive knowledge, a should have known standard. Does an entity like your client have the ability to determine whether someone to whom one of these e-mails with a link is sent has opened up the link? Verrilli, so we, with respect to this, you know, in this case, no. Generally, it's difficult. Alito, but you could do that. Certainly, Intel would have the ability to do that, wouldn't it? Verrilli, it could, I think, yes. I think it would be very difficult and time-consuming. And I don't think it would change the issue, because I think even if we could establish that the planned participant clicked on the link, then the argument is going to be the same argument. It's going to be, yes, I clicked on it, but I didn't read it. Or I read it, but I didn't remember it. And therefore, I don't have the subjective awareness that the Ninth Circuit said is required. And so I don't think, and I understand why you might think that that's a solution, Your Honor, but I don't think it is. I think it just shifts the problem over a little bit, but it's the exact same problem. And I think it points up why the right way to read this statute. Now, we are arguing for an imputation of knowledge, not an empirical assumption. We are doing that, but we're doing that because we think that is the most sensible way to sync up what the statute has done here, which is to impose a very robust disclosure, set of disclosure obligations for the purpose of giving planned participants the ability to police their rights. Why isn't the way, sorry, why isn't the way to think about this that, as you say, this is an unusual provision, and you make a lot of strong policy arguments, but for whatever reason, in the amendment of the statute, it just came out as actual knowledge, and it's an unusual statute, but we stick to the words of the statute, and Congress can, of course, fix it to bring it in line with the other constructive knowledge statutes if Congress so chooses, but we shouldn't rewrite it ourselves. What's wrong with thinking about this that way? Well, Your Honor, in Yates, the Court concluded that fish was not a tangible object, even though in ordinary English, it's obviously a tangible object. You can hold it in your hand. In Brown v. Williamson, the Court concluded that nicotine was not a drug for purposes of the Food, Drug, and Cosmetic Act, even though in common understanding, nicotine is obviously a drug. So what I guess I would say is that I don't think it's rewriting the statute at all. It's taking a ‑‑ what it's doing is reading those words in context in order to make sense of the statute as a whole, which was exactly the analysis in Yates and Brown v. Williamson and last term in Jackson with respect to what the word defendant means, and in King v. Burwell, and it's that ‑‑ all we're urging is the Court apply that same way. Don't take the words in isolation and just look them up in the dictionary, and particularly don't do it here, because this actual knowledge standard that my friends on the other side are transplanting here, what they're transplanting is a body of law that applies in a totally different context that doesn't have anything to do with a regime of disclosure and a statute of limitations. It's about assessing personal culpability in the criminal and enforcement context. And in this context, I think that you've got to read these words in conjunction with ‑‑ But if we were to say what you want us to say here, actual knowledge is in effect a form of constructive knowledge that could open up all sorts of problems in other statutes down the road that we can't even foresee here, where the argument would be that constructive knowledge is enough to satisfy a knowledge requirement. I don't think so for two reasons, Your Honor. First, we're not asking you to adopt a constructive knowledge standard. We're actually asking you to interpret the words actual knowledge to include the information, the knowledge that is transmitted to, the information that is made known to the planned participants through a disclosure. That sounds like constructive knowledge to me. I don't think so, Your Honor. In the same way that you ‑‑ you might say the same thing about willful blindness being constructive knowledge, but I think it is an imputation to be sure, but it's an imputation that's legitimately within the meaning of the words actual knowledge. And the other thing I would point out, Your Honor, is that until the Ninth Circuit ruled in this case, the rule that everybody's been living under, or ERISA, is our rule. This is the way the courts had uniformly interpreted it until the Ninth Circuit in this case, and everybody understood that that's the way the statute operated. And so the ‑‑ so in that sense, I don't think that the problem that Your Honor has identified as a problem, you would have seen it already. Are you relying on court ‑‑ other court of appeals decision that says actual knowledge means you had access to the information, the information was available to you? Have ‑‑ what courts have held that? So the Eighth Circuit decision that created the conflict in this case, created the conflict in this case.   You have the information. You have actual knowledge. You have it. I mean, the statute has had actual knowledge. So ‑‑ But are there other ‑‑ so we have the Eighth Circuit and the Ninth Circuit. And this is ‑‑ the Second Circuit interpreted the language, had actual knowledge in a different context. We discussed this in our brief, so it's not a precise holding on this issue. But it interpreted it in the way that we've interpreted it in a related ERISA statute limitations context. And then you have the consensus in the district courts, which actually got to grapple with this issue as a practical matter in case after case after case. They've all come to the conclusion that you should read the actual knowledge standard to be satisfied when you can demonstrate that the ‑‑ that the planned participant has ‑‑ How many district courts? So I think there are ‑‑ I don't know the exact number off the top of my head, but I think it's at least a half a dozen or so, maybe more than that, that have grappled with it, and they've all come to that conclusion. And so ‑‑ and I think there's a reason for that, because it's an understanding that the way this system is supposed to work is that planned participants are supposed to be apprised of the information they need to, in the words of the Senate report in 1974, police their rights, and the way ‑‑ and they're given an express private right of action in ERISA to police their rights. It is difficult to imagine a half dozen out of 98, 99 district courts as establishing a firm pattern, but put that aside. You were ‑‑ not you, but I think whoever handled this case below, was asked whether a comatose person who received an e‑mail with this planned disclosure, would that person have actual knowledge? Could you answer that question? And let's put aside the comatose person. Is there an obligation on planned participants to actually open e‑mails? There's no legal obligation to do that. And with respect to ‑‑ So how ‑‑ I know plenty of people who never open e‑mails, or only open e‑mails from certain individuals or in certain situations. So under your theory of the case, those people, the knowledge is imputed merely because they received the e‑mail? So take the comatose person first. I think in extreme cases like that, the way the law would handle it is the way the law always handles it, through the doctrine of equitable tolling. In a situation like that, I can't imagine that equitable tolling wouldn't apply in that kind of an extreme case. Now, I will say ‑‑ How about handling it through the language of the statute, actual knowledge? That person doesn't have actual knowledge. Well, I think, but then the problem with reading it that way is you create a situation in which there can never be summary judgment in one of these cases with respect to the 3‑year statute of limitations, and so you're imposing very substantial burdens. I don't know. There's plenty of e‑mails that I get that require me to say that I've read the terms and conditions. Yes, Your Honor, but I think that what the plaintiff ‑‑ Your Honor wouldn't do this, but what a plaintiff would do in that situation I think would say, yes, I clicked on the box, but I didn't actually read them, so I didn't actually have knowledge. And I do think that points up something about the argument my friends on the other side make. They do say in page 1 of their brief, well, if you read it, you have actual knowledge, but you don't actually have ‑‑ the proof if you read it doesn't establish subjective awareness. And possibility that a plaintiff under oath will tell the truth. Of course. Of course, that's right, Your Honor. But ‑‑ And so he'll say, I read it. And his attorney will say, if you read it and you say you didn't, you're in trouble. That's correct, Your Honor. But even in the best of circumstances, the people's ability to recollect whether they read things 4, 5, and 6 years earlier I think is going to be ‑‑ No, if they didn't read it, I mean, you've been ‑‑ you've heard the argument. If they didn't read it, I mean, why should they? I mean, these are ordinary workers across the country. They don't read everything. And if they didn't read it, then they didn't read it. Then it's 6 years they have it. But why is that a problem? Well, I think it's a problem for, I can think of at least three reasons why it's a problem. You're going to ‑‑ you're taking the period in which a plan is subject to hindsight bias with respect to its investment decisions and doubling it from 3 years to 6 years, which means not only are the plans going to be vulnerable to litigation over that whole 6‑year period, but the amount of damages could be considerably higher. And I would think if anything in a case where you're talking about breach of fiduciary duty, what you'd want is an intervention sooner rather than later to get to cure the breach. So that seems to me a very substantial problem, and a problem that inures to the detriment of plan participants, of course, because those are costs to the plan, and that kind of excessive liability can discourage the creations of plans in the first place, which is why this Court has always said you have to approach a risk in a balanced manner, and that kind of balance is what we're advocating for here. Second, I think it will introduce an element of randomness and inadministrability to the statute, because it's always, virtually always, maybe there's going to be the rare case that Your Honor hypothesized where the plaintiff testifies, yes, I did read it, yes, I did remember it, but in most cases it's going to be inferences from circumstantial evidence, and I think it's going to be some courts going one way based on inferences from circumstantial evidence, other courts going a different way based on inferences from the same kind of statute. Sotomayor, what would the circumstantial evidence be? Verrilli, I suppose it would be evidence like we had in this case, that the plaintiff visited the website 68 times and clinked on 1,000 links and clicked on, in particular, on a link that said that he was going to attend a seminar explaining the investment options, which then said he didn't attend. But I think you're just going to have random results in district court, and I think with respect to a statute of limitations, one thing that one would want is consistent application. So that's what I'm saying. Mr. Verrilli, we have consistent application. We have a backstop of 6 years, as Justice Ginsburg has pointed out. And these are very good policy arguments for maybe making that shorter. But those are our – that's not our province. That belongs across the street. So I guess I'm wondering, what cut do these policy arguments have? You're not suggesting that an irrational Congress, only an irrational Congress could come up with a scheme in which 6 years is the backstop, such that it's – it would be beyond the pale to imagine a Congress that could come up with a scheme that would require 3 years? May I answer? Thank you. So, Justice Gorsuch, with respect to that, I think that you have to impart the rationality to the Congress also with respect to the 3 years, that it's in there for a reason. The reason is to protect plans when they have to. Well, both sides agree that there's a reason for it. They just disagree what that reason is. Well, but I think, respectfully, what I would suggest is we're suggesting a real reason that makes sense in light of the disclosure obligations. They're coming a hair's breadth within reading it out of the statute. Thank you. Thank you, counsel. Mr. Wessler. Thank you, Mr. Chief Justice, and may it please the Court. When Congress said that a plaintiff must have actual knowledge, it meant what we all understand that phrase to mean, that the plaintiff himself must have real awareness. The ordinary definition of actual knowledge controls here because it accords with the fundamental rule that statutory interpretation begins and often ends with the plain meaning of the text. Congress chose to require actual knowledge, not constructive knowledge, before the general 6-year limitations period for breach of fiduciary duty claims will be cut in half, and that deliberate decision must be honored. Now, the common-sense distinction, I think, is all that's necessary to resolve this case, but there are important reasons, as I think I heard just now, for why Congress would have made the choice to require actual knowledge here. Setting the bar high before the 6-year limitations period will be cut in half reflects what I think is a basic real-world fact. Most people don't read these complicated financial disclosures cover to cover. If you open the Joint Appendix to almost any page, you can see why. These documents are chock-a-block full of dense financial market projections, asset allocations, and other jargon. People with busy lives and with little or no financial investment experience or training are not poring over these disclosures line by line to flyspeck every statement on the possibility that it might contain the kernel of breach under ERISA. I think it's actually just to the contrary. Because fiduciaries owe an unyielding duty to act in participants' best interest, most people trust that their fiduciaries are not breaching their obligations. Given that real-world understanding, I think it's perfectly sensible that Congress decided not to start the 3-year clock running the moment a participant receives these disclosures. And I want to emphasize this. I think it's all the more true because the general 6-year period does provide a concrete cutoff for most breach-of-fiduciary-duty claims, and that 6-year cutoff is among the shortest general limitations period in ERISA. With Section 1113, Congress set an important balance. Although there's a high bar to trigger the 3-year exception, fiduciaries can count on 6 years being the outside limit, and there's almost no other limitations provision in ERISA that provides this level of protection for defendants. Ginsburg. But the problem is how easy one can say, I didn't read it. Is it your position that that's enough? If the plaintiff says, I didn't read it, the court has to accept it? That – I mean, how can the veracity of that statement be tested?  I do think that a plaintiff, if a plaintiff did not read a statement, that is likely enough to survive summary judgment and take this question to a fact finder, in the same way, Justice Ginsburg, that all sorts of fact-specific questions that come up in the context of statutes of limitations are not amenable to summary judgment. But, of course, as was surfaced in the first half of this argument, it is entirely possible that circumstantial evidence would prove that a plaintiff either read or knew of a particular fact. What would the – what would the circumstantial evidence be? In this case, I think, provides a useful illustration. In this case, there were pages of printouts of websites that the plaintiff had visited. Now, he testified, I didn't go to the specific pages that contain what you say is the relevant information, and throughout the entire course of this litigation, up through now, the defendants were never able to come forward with specific page views to contradict that testimony. Alito, but your position is even with all that evidence, your client would not be subject to summary judgment, right? I think there would be a disputed issue of fact at that point that would reach – would have to go to a fact finder, that's correct. But, again, I don't think that's any different from the way fact issues come up in the context of statutes of limitations. But you make a – everything that you've said makes a good policy argument for saying, let's just have a 6-year period, because people don't read these statutes things and they're hard to understand. But why would Congress add to the 6-year statute of repose this requirement of actual knowledge, which is very unusual in statutes of limitations, and will almost always prevent summary judgment? It will almost always raise a difficult factual question that requires the district court to make a credibility determination. Why would that be – why would Congress think that's worthwhile? So, of course, we don't know because there is no relevant legislative history. That cuts one way or the other on this question. But, I mean, I think it's worth emphasizing that this statute covers a broad range of different kinds of breach of fiduciary duty claims. It includes, for instance, co-fiduciary claims, right, a claim in which a co-fiduciary knows that there has been a breach of another fiduciary's duty of prudence to the participants or to the plan. And this 3-year period triggers and incentivizes that co-fiduciary to come forward and bring a claim to minimize the losses to the plan. That's an example of a kind of claim that would be subject to this 3-year exception and wouldn't require any kind of, you know, fact dispute about what the co-fiduciary knew because they were involved in the decision-making. The same is true, Your Honor, for claims that arise when one party is subject to the transaction that forms the basis of the breach, right? There's a whole range of prohibited transactions where the transaction itself is the breach and a party who is – someone who is a party to that transaction has knowledge. Alito, in all those cases, the potential plaintiff would have reason to know, right? So if the tests were reason to know, it would be easily satisfied. You wouldn't need to require actual knowledge. I mean, I think that is entirely possible that Congress could have drafted this statute in a different way, but it chose to draft this statute in this way, and I think that deliberate choice deserves and is entitled to respect and it must be honored by this Court because it used the plaintext actual knowledge, which I think as we all sort of understand is defined in contradistinction to a rule that would allow a court to imply or impute knowledge to a person who does not themselves personally.  Yes, Mr. Woesser, suppose a plaintiff says, you know, I did read it. I just didn't understand it. Does that always get press into judgment? Woesser Yes, I don't think reading is suficiente to establish knowledge. Now, when this case comes to the court, though, the Petitioners have asked the court to assume that had one just read all the relevant grades in this case, that reading would have imparted the necessary knowledge to know that there was a breach. And so I don't think that the court needs to reach this question of how much did you need to read or how much did you need to understand. Kagan But your view is if somebody said just I didn't get it. Woesser I think that's insufficient to meet this high bar. So I don't think that if you could come in and say I just read it and that would be enough. If you didn't understand it, you didn't know it. But again, as the question has been presented to the court, the only issue is whether actual knowledge means you knew it or you can – the court can conclude as a matter of law that even though someone didn't read it, they nevertheless have actual knowledge. Alito But if they knew, yeah, I read it and I saw where they were investing, but I didn't really understand the nature of these companies they were investing in, would that be enough? Woesser I don't think so, Your Honor. I think that it depends on the nature of the company. Alito So then this is meaningless. The actual knowledge is meaningless. Woesser Oh, not at all. It absolutely depends on the nature of the kind of breach claim that is at issue in the case. Again, this statute covers a broad range of different kinds of claims. In addition to the co-fiduciary claims I explained earlier, take the fact pattern that this Court had in LaRue, which was an account liquidation delay breach of fiduciary duty claim. A participant calls up the fiduciary and says please liquidate the assets from my account tomorrow. A fiduciary fails to liquidate the assets and there's a resulting loss. Well, the participant in that case has actual knowledge that there's been a breach and the 3-year clock is ticking. But what Congress didn't want to have happen is exactly what the Petitioners are asking this Court to do, which is to allow fiduciaries to stick into these documents sentences, paragraphs that will never be read, and as a result have this 3-year exception ticking before anybody really knows what's going on. Kagan, Mr. Wessler, just coming back to the circumstances of this case, or the context of this case, how about a person who says I read it, I thought I understood it, I didn't – what I didn't really get was that it could be the foundation of an ERISA claim. Wessler, Right. So there is this, I think, separate question that is not in front of the Court right now, which is, Justice Kagan, what you've identified, how much do you need to know that there's been a breach of ERISA? Now, I think the Ninth Circuit articulated the correct standard in this case, but this is not being asked in this case to decide that question, because, again, as I said, as the Petitioners have framed this question, they've asked the Court to assume that all the relevant information was contained in the disclosures and that had a participant read those disclosures, they would have the necessary knowledge. Ginsburg, you style this case a class action. How does the Court determine who are the members of the Court, members of the class? That is, some will have read the disclosures, some will have not. How does the Court determine who is properly within the class of non-readers? Does every planned participant have to come into court and say, I read it or I didn't read it? Wessler, Sure. So, I mean, what I think Your Honor is asking is a good question, which is whether and when individualized issues that might relate to the statute of limitations could affect class certification, and I think Rule 23 has mechanisms that are designed precisely to assist courts in making those decisions. But I think that's a Rule 23 question, not a question about how we interpret the plain words of this statute. It is a little bit like be careful what you wish for, isn't it? I understand, but I think you can find rafts of cases where courts are struggling with individualized statutes of limitations issues in all sorts of contexts. I mean, this question, what does an individual know and when, doesn't just come up in this context. It comes up in all sorts of limitations periods questions, equitable tolling, actual knowledge in a statute that says actually knew or should have known, where what's at issue is an individual's actual knowledge. And courts have developed methods to determine whether, for instance, the named plaintiff is adequate or typical, or whether those individualized issues might affect the law. Breyer. The way I listen to this, there is nothing, virtually nothing a fund can do to make certain that a member or someone who has interest in it, the worker, actually does know about a bad investment decision, which is a big class of things, not just the one. Sure. Nothing. They can put someone on the lawn shouting. I shudder to think about the telephone calls. You must listen to the, you know, not even that will work, thank goodness. But therefore, it used to be that were this legislation in a Senate committee, there would be a report, and the report would be this particular provision is likely to make a difference in the cases you mentioned, but it is not likely to make much difference in cases of bad investment decisions, and there we intend six-year statute of limitations. So my question is, you've probably looked into this, maybe not anymore, but I'd hope you'd looked into it. And is there anything in that history that says that that's what we want? We want six-year statutes of limitations for bad investment decisions. But we'll take three-year statutes where he was, for example, and then you have the six examples you gave. Is there anything? No. We have, I mean, no one has been able to find, I mean, I wish I could tell you a different answer, but I can't. There's nothing in the history that suggests one way or the other what Congress had in mind, specifically when it adopted this framework. But I will say, I think that the 1987 amendments, which, you know, you heard a little bit about during the first half of the argument, indicate pretty strongly that Congress wanted to remove the one mechanism it had in place in this statute to start the clock running for a broader set of claims, which is the constructive knowledge trigger. Kagan. Well, what about Mr. Varelli's argument, that that would have seemed, in the original version, would have seemed a bit insane, right? If the Secretary knows, you can't sue. But if you have gotten the disclosure, then you can, then, yeah. Sorry. No, go ahead. So I think that is a nice and perhaps clever theory, but it's demonstrably wrong, and here's why. If you look at the original version of ERISA 29 U.S.C. 1021 of the 1974 Act, and it's this provision that governed those disclosures that needed to be sent to participants and those disclosures that needed to be sent to the Department of Labor, it was in effect all the way up through the 1987 amendments, those documents that were required to be sent to participants, including the SPD and a statement of the plan's assets and liabilities, were among, were all among the documents that were also being sent to the Department of Labor. So under the pre-amendment version, even if you kind of think maybe Congress was doing something funky with actual knowledge, participants were in fact charged with constructive knowledge of all the documents that ERISA required fiduciaries to send to them in exactly the same way as the Department of Labor was, had constructive knowledge of the documents that were being provided to it. So there's no gap between the constructive knowledge trigger for those documents provided to participants and those that are provided to the Department of Labor. And I think, you know, what we can see, given that, is that, you know, although there's no legislative history, we do have this D.C. Circuit opinion called FINK, which the Court issued about a year before the 1987 amendments. And what they said, what the Court said in FINK is, look, these documents that are being filed with the Department of Labor, they're complex, they're complicated, it's even hard for the Department to get on top of everything that's going on here. To have the clock running on this 3-year exception based just on the filing of these documents doesn't seem to us to make very good sense. And shortly after that opinion, what happens? Congress amends the statute to take out that constructive knowledge trigger. Alitoson, everything that was sent to the Department of Labor was also sent to the participants. Was anything sent to the Department of Labor that wasn't sent to the participants? Yes. The universe of documents that went to the Department of Labor was broader than those documents that were being sent to participants. But what the participants were getting was also being sent to the Department of Labor. Well, if what was sent to the Department of Labor was broader, then I don't know what's the participants would be out of court based on things that were sent to the Department of Labor but never sent to them. I agree. I think on the old version, I don't agree that that's the end for us. But I agree that under the old version of this statute, participants were being charged with knowledge of documents that they themselves were not receiving. But I don't take the Petitioners here to be arguing that the fact that the Department of Labor was getting more documents suggests that the language that Congress used or what it had in mind when it used actual knowledge was something other than the ordinary meaning of that term. I think the argument, in their view, is how would it make sense if the participants were getting documents and didn't have any constructive knowledge being assessed against them based on those documents? That, I think, is not borne out based on the original version of the statute that was in place up through the amendments. I think just to return to the one kind of final point I'd like to make, which is that when you boil it down, the Petitioners' argument amounts to a theory that actual knowledge really means implied actual knowledge. A court can imply something even if an individual personally doesn't have it. But that's about as oxymoronic as it sounds, and Section 1113 doesn't contain an implied implied. And reading that term into the statute here would essentially do the exact opposite of what Congress deliberately chose to do when it eliminated any constructive knowledge trigger in 1987. Kagan What would you do with cases of willful blindness? I mean, suppose somebody says, you know, I am specifically not going to read this because I want to keep my three-year statute of limitations. Right. So, I mean, just to be clear, willful blindness, all it is is a jury instruction. So it doesn't permit a court to impute as a matter of law anything about an individual's knowledge. It's the ostrich instruction. You know, you stuck your head in the sand and a jury gets to decide as the factfinder, although here it would be a judge because we're in ERISA, you know, whether who's credible and what that actually means. But I will say Congress knows how to adopt willful blindness into a knowledge statute and has done so on many occasions. It writes statutes that says you either have actual knowledge of a fact or you took action to avoid obtaining such knowledge. There are dozens of statutes that look like that. Congress has not done that here. Kagan So that person still has the six-year statute? Well, I mean, willful blindness has never been imported into ERISA and I don't think there's any statutory basis to do so here. Justice Kagan, as you pointed out earlier, willful blindness itself is not the same as actual knowledge. And I think that's what this court said. Roberts But counsel, you started this by acknowledging that often it is a jury instruction and my understanding is similar, that it can be evidence of actual knowledge, right, that if someone protests too much, that they have failed, that they don't know anything about it. I was – I had my head stuck in the sand over here. A reasonable juror can say, I just don't believe that. And that's actually evidence that you knew what was going on. And you're not suggesting that that kind of use of willful blindness is impermissible here, are you? Kagan I think that, just to back up, since we're in ERISA, you know, you wouldn't be in front of a jury. Roberts Of course. Kagan You would have a judge making this fact-finding decision. And I think absolutely, at that stage, credibility plays an enormous role, and likely will play an enormous role, in whether somebody was – was either not being accurate when they said they didn't read something or that they didn't understand it. And I think that's precisely the way that these statutes of limitations issues get resolved when they pass through the summary judgment stage to reach that. Kagan But I guess what I – my fault for not expressing the question clearly enough, but does one get past the summary judgment stage if it's clear that one was being willfully blind? Kagan I still think that there's a – yes, because I still think there's a credibility issue in play. And willful blindness itself is a fact-finding tool. It's a – it's an instruction to the fact-finder to draw inferences about an individual's behavior or conduct. Alito Can I follow up on one question Justice Ginsburg asked, which – and read you something in the reply brief? The reply brief says, The need for individualized timing determinations should preclude class certification in virtually every case. And I just want to give you a chance to respond to that. Justice Kagan If I may. I mean, we – we don't agree with that characterization. And it may be that in certain cases, individualized issues will pose difficulties for certifying classes. You can find that across the range of statutes of limitations issues when they arise at the Rule 23 stage. But to say as a – as a matter of – that it's a categorical rule that that would be true is, I think, inaccurate and would – would, I think, undermine the point of Rule 23 itself. Thank you. Roberts Thank you, counsel. Mr. Garnieri? Garnieri Thank you, Mr. Chief Justice, and may it please the Court. This case can begin and end with the plain language of Section 1113.2. The 3-year limitations period in Section 1113.2 begins to run only when the plaintiff has actual knowledge of the breach or violation. To have actual knowledge, the plaintiff's knowledge must exist as a matter of fact. Knowledge that is imputed or implied to the plaintiff as a matter of law does not suffice. That is what actual means in this context. If that standard is not met, then the default 6-year period in Section 1113.1 governs the timeliness of the plaintiff's claims. Now, Petitioners argue that in applying Section 1113.2, a court should presume that the plaintiff has actual knowledge of the contents of the ERISA disclosures that the plaintiff receives at the precise moment that the plaintiff receives them, even if the plaintiff indisputably never read those disclosures. That approach cannot be squared with the language of the statute. In ordinary English, no one would say that a person has actual knowledge of the contents of a document that the person has never read. So, too, here, the 3-year period begins to run only when a plaintiff is, in fact, aware of the relevant information. Constructive knowledge is not sufficient. How far do you go with the requirement of actual knowledge? The question that was asked earlier, do you have to understand what the words mean? Yes, we do, Mr. Chief Justice. So even if it's an objection, you'd say you have actual knowledge of the significance of the information, even though you don't know what a leveraged, diversified, you know, hedge, whatever it is. As a general matter, the statute requires knowledge, and we think knowledge connotes that there has to be some degree of comprehension. Now, as Mr. Wessler alluded to earlier, there is a distinct question not presented here, which is, you know, what do you need to have actual knowledge of? What does it mean to have actual knowledge of the breach or violation? But at least with respect to the question here, I mean, the statute requires actual knowledge, and we think that means you have to sort of actually be aware of the relevant information. One can imagine, to take a simple example, one can imagine a circumstance in which the planned participant does not speak English and receives disclosures that are written in English. And in that case, I think it would be silly to say that the planned participant nonetheless should be conclusively presumed to have actual knowledge of the contents of disclosures that, by hypothesis, that plaintiff would not have understood even if she had read them. Sotomayor, I'd like to follow through on the Chief Justice's question. I am reading it. Actual knowledge of the breach or violation. Let's assume someone read it. Go through Justice Kagan's earlier questions. Someone read it and says, I didn't understand it was a breach. I didn't understand it was a violation. If you do not understand the facts, I read it, I saw it, I saw exactly what was here, the distribution of investment here. Well, if you do not understand the disclosures that you have received, we do not think that as a matter of ordinary English, you can be said to have actual knowledge of the contents of those disclosures. Now, stepping back as a general matter, with respect to that separate question that I alluded to earlier, what is the breach or violation? What is it that you have to have actual knowledge of? Every court to examine that has concluded that you do not need to have knowledge that it is a legal violation of ERISA. So we don't think the standard would go that far. But, you know, if the testimony is, if the evidence is that the plaintiff says, you know, I looked at that disclosure, but I did not understand the import of the terms used in it, then, you know, you have not met the actual knowledge standard. Sotomayor, I'm having that line is what I don't understand. But in any event, the conclusive legal presumption of actual knowledge that Petitioners are seeking in this case is nothing like that. The rule that Petitioners are advocating here would impute to every planned participant actual knowledge of the contents of all of the mandatory ERISA disclosures that the plaintiff receives. Mr. Guarnieri, I mean, if we're going to be a textualist, it's actual knowledge of the breach or the violation. It's not actual knowledge of the contents of the disclosure statement. So that would suggest that your position has to go even further, that you have to have actual knowledge of the breach, meaning that you need to know that, you know, whatever investment allocation it was, in fact, breached ERISA. Well, I don't think that that's correct, Justice Kagan. We don't think you actually have to know that it was a legal violation of ERISA. We think in that respect the Ninth Circuit got this basically right in its articulation of the standard. The idea is that the plaintiff has to have actual knowledge of the essential nature of the breach or violation. So in general you're going to have to know that it was a legal violation of ERISA. So that makes sense. I guess I'm just pointing out that that's not – I mean, if you're really taking the text seriously, I think you would come out in a different place. Well, we are trying to take the text quite seriously, and we do think Congress used precise language in this particular limitations provision, which requires actual knowledge as opposed to simply knowledge. But, you know, to know that there is a breach, I think, in this context, for example, in a duty of prudence, if the claim is that the fiduciary violated the duty of prudence, then the plaintiff would need to know that what the fiduciary did was imprudent, but not necessarily that what the fiduciary did violated ERISA. And the same would be true for claims sounding in the duty of loyalty or prohibited transactions. You need to know sort of the essential nature of the wrongdoing, but not that it violated ERISA. Alito Look, you have a strong textual argument. There's no question about that. But even putting aside the issue of whether the potential plaintiff has to know that it was a breach, even assuming that all the plaintiff has to know are the facts constituting the breach, why would Congress think it was worthwhile to put this actual knowledge requirement in? Why not just have the 6-year period in recognition of the fact that a lot of people, maybe most people, maybe nearly everybody, doesn't read these things, doesn't understand them? Why is it worth the effort? Mr. Burschel Well, Justice Alito, I think the statute reflects the following intuition. I mean, the 6-year provision really is the backstop. So in general, you have 6 years from the breach or violation in order to bring suit. The 3-year provision only comes into play if the plaintiff requires actual knowledge of the breach or violation in years 1, 2, or 3, because after that point, the 6-year period will expire before the 3-year period. So basically, the intuition is — Justice Alito I understand that. But, you know, putting aside the super-honest plaintiff who is an expert on investments and actually did read it and actually did understand it and testifies, yeah, okay, you got me. I did it. What else is this going to achieve? Mr. Burschel The idea is that the plaintiff who does happen to acquire actual knowledge of the relevant information within those first 3 years can be expected to bring suit within 3 years and does not need the full 6-year period in which to bring suit. And there — Justice Alito I think, Mr. Burschel — keep going. Mr. Burschel There are reasons that Congress would not have wanted a plaintiff in those circumstances. The plaintiff who really does have actual knowledge to delay bringing suit, delaying — many of these suits are brought for the benefit of the plan as a whole, and a delay of a substantial period of time can redound to the disadvantage of other plan participants who would have been better served had the suit been brought earlier. I think that's the basic logic of having the two standards in the statute. Justice Alito I think Mr. Verrilli's point, though, is that it's impossible to prove actual knowledge under the answers that have been given here, and therefore you end up with a de facto 6-year statute of limitations, which is very unusual, long period of time, and going to cause a lot of negative consequences, he says, and therefore that context means that we must be reading actual knowledge wrong. So how do you respond to that? Mr. Burschel Of course, we disagree with Mr. Verrilli's articulation of the policy balance that's at issue here. But just to take the question on directly, there are many reported decisions applying the actual knowledge standard to find a suit is time-barred, even under the correct understanding of the statute, meaning the knowledge must in fact be actual and not merely imputed to the plaintiff as a matter of law. Now — Alito Well, give me an example where that could be done on summary judgment, a real-world, realistic example of where that could be done on summary judgment. Mr. Burschel Well, for example, I mean, a common fact pattern is that a planned participant will consult with another financial professional who will explain to the planned participant, you know, the investments that are in your retirement fund are imprudent for someone in your circumstances. A conversation like that would give that plaintiff actual knowledge of the breach or violation if the claim is that the investment was imprudent. So — and that's not fanciful. There are cases like that. So it's not the case that rejecting the rule that Petitioners advocate here would make the 3-year limitations period a nullity. It does have real force and effect, and it has had real force and effect in the many circuits that have adopted the correct interpretation of the statute. And on that point, I'd like to address one claim that Mr. Burschel made earlier. Kennedy Can you make sure to address Justice Ginsburg's class certification question before you finish? Burschel Sure. Well, I entirely agree with Mr. Wessler's answer on that question. I mean, in general, the fact that you may have an individualized limitations defense with respect to some members of a putative class would not necessarily foreclose certification of that class. I mean, in the same way, you might have a release and settlement defense with respect to some plaintiffs, if not others. The injuries may be different for members of the class. The fact that there are — Roberts Well, but except if you think that the actual knowledge issue would be satisfied or a requirement in most cases. In other words, there would be few members of a purported class action because most people are not going to have actual knowledge. Burschel Well, I think in general, the Rule 23 question would be whether the injuries asserted by the plaintiffs are amenable to class-wide treatment. And the fact that there is a defense that might be applicable to some, but not other members of the class, would not necessarily preclude class certification. Roberts Thank you, counsel. Mr. Verrilli, 5 minutes. Verrilli, Thank you, Mr. Chief Justice. Three points. First, I would like to return to the 1974 version of the statute, and in particular to the question that Justice Gorsuch asked me at the end of my opening argument. I think what we heard from my friends on the other side here is that there are two things. First, that the — with respect to the 1974 statute, the extreme anomaly that I identified is there, that it doesn't make any sense to think that the statute — that Congress would have adopted a statute that said the 3-year statute of limitations is going to be triggered based on the information provided to DOL, but not on the information provided to you. Sotomayor I'm sorry, Mr. Verrilli, I went back to that statute and what it says, on which a report from which he could reasonably be expected to have obtained knowledge of such grief. I read that as potentially excluding those documents that only the Secretary has. Verrilli, I think your adversary was right that the documents that the individual received could give them reasonably be expected to have obtained knowledge, but not necessarily those that only the Secretary receives. Verrilli, So, Justice Sotomayor, I understood my friend on the other side to say the to have any knowledge provision triggered by the disclosures that went to the individual, because everything that went to the DOL was going to trigger the 3 years anyway. And I think, if you think about that for a minute, that blows up their whole theory of the statute. Because what they're saying is in 1974, Congress enacted a statute that was actually quite harsh, that the default was going to be a 3-year statute of limitations if the information sufficient to show breach was sent to DOL, whether you got it or not. It would actually be the odd case that was the 6 years under that theory, not the normal case. And, of course, when Congress amended the statute in 1987, it did not change the words had actual knowledge. So the meaning you're trying to ascertain is the meaning that those words had in 1974. And so I just think that their whole theory, nobody reads as a, you know, that's all blown up by what they said about what happened in 1974. Now, second point, if I could, with respect to the Justice Breyer, you asked about consequences, and there was a robust discussion about the class action impact here. I do think what my friends on the other side are saying essentially is that, and to put it exactly this way, they spoke at a higher level of abstraction, but basically what they're saying is here's what will happen in class actions. You'll just defer the question of whether there's a statute of limitations defense to the remedial phase. And then you'll have trials at the remedial phase of a class action about whether every single one of the class members had this actual knowledge or not based on these kinds of circumstantial proof that we were talking about. Just think of what a catastrophe that's going to be in the class action context. So in the unlikely event that this Court disagrees with our position on the merits, I would hope that there would be clarity here as to how this reading will play out in the class action context, because that would be a staggering, enormous negative consequence. After all, it does put the cart before the horse, because statute of limitations is a threshold defense. And so the idea that you would do it in that manner, I think, is just a catastrophic problem. And then with respect to the discussion, the colloquy on willful blindness, I understand my friend's position that it's just a jury instruction that allows an inference of actual knowledge. But respectfully, I don't think that's the way this Court described it in the Global Tech decision. The Court basically said, as I read Global Tech, that it's not. That proof of willful blindness, proof of the circumstances that would allow you to establish willful blindness, is not proof of subjective awareness. But it's something that you might consider as being just as culpable, or that they, in effect, have actual knowledge, but not that they actually have actual knowledge. It's an imputation. I just think that's as clear as can be from what this Court said in Global Tech. And so I think the question here is whether, in this very different context, where, as I said, these actual knowledge standards come virtually exclusively from criminal enforcement proceedings, where you're trying to measure the individual defendant's culpability. And of course, there should be an inquiry in that situation into the specific state of mind of the defendant. That's what the whole culpability inquiry is about. Here, you're talking about a statute of limitations, and in particular, let me finish, a statute of limitations that's designed this three-year period to protect the interests of defendants. And so it's important to balance those interests when reading the statute. Thank you. Thank you, counsel. The case is submitted.